UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CALVIN WHITLEY,

                               Petitioner,                      00 Civ. 4737 (PKC)

       -against-                                           MEMORANDUM
                                                              AND
DANIEL A. SENKOWSKI, Superintendent,             ORDER
Clinton Correctional Facility,

                               Respondent.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        The late Judge Richard Conway Casey denied this petition for writ of habeas corpus, finding that it was untimely under the statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2244(d)(1).[1] The United States Court of Appeals for the Second Circuit vacated the judgment and remanded to the district court to consider, among other things, whether petitioner had made out a credible claim of actual innocence. Whitley v. Senkowski, 317 F.3d 223 (2d Cir. 2003). It is an open question in this Circuit whether a credible claim of actual innocence either is an extraordinary circumstance warranting equitable tolling or gives rise to a constitutionally mandated exception to the limitations period. See Doe v. Menefee, 391 F.3d 147, 160 (2d Cir. 2004), cert. denied, 546 U.S. 961 (2005); Lucidore v. New York State Div. of Parole, 209 F.3d 107, 114 (2d Cir. 2000), cert. denied, 531 U.S. 873 (2000).

        Whitley's petition was remanded for consideration of four questions: "(1) whether Whitley pursued his actual innocence claim with reasonable diligence; (2) if he did

---

[1] A prior habeas petition by Whitley, filed on December 12, 1991 in the Northern District of New York, had been dismissed. Whitley v. Senkowski, et al., 91 Civ. 01408 (FJS) (N.D.N.Y. Jan. 9, 1992), appeal dismissed, 92-2067 (2d Cir. June 1, 1992), cert. denied, 506 U.S. 920 (1992). There is no indication that Judge Casey or the Second Circuit was aware of this circumstance or that there was any analysis of the appropriateness of a successive petition.

not pursue the claim with reasonable diligence, whether an actual innocence claim must be pursued with reasonable diligence in order to raise the issue of whether the United States Constitution requires an 'actual innocence' exception to the AEDPA statute of limitations; (3) if he did pursue the claim with reasonable diligence or if reasonable diligence is unnecessary, whether Whitley makes a credible claim of actual innocence; and (4) if he does make a credible claim of actual innocence, whether the United States Constitution requires an 'actual innocence' exception to the AEDPA statute of limitations on federal habeas petitions." Whitley, 317 F.3d at 223-24.

The mandate of the Circuit requires that the district court "examine" the questions "sequentially." Id. at 225. Accordingly, before addressing whether Whitley has a claim of actual innocence, this Court must examine whether Whitley pursued his actual innocence claim with reasonable diligence and, if not, whether such pursuit is necessary. The mandate does not leave it open to the district court to forgo the threshold questions and adjudicate the merits of the habeas petition, which raises ineffective assistance of trial and appellate counsel.

Background

Petitioner was convicted after trial in Supreme Court, Bronx County, New York, of murder in the second degree, N.Y. Penal Law § 125.25, and of assault in the first degree, id. § 120.10. The evidence at trial included the testimony of three individuals who were acquainted with Whitley prior to the June 10, 1982 shootings and testified that they saw him shoot one of the two murdered victims. One of the eyewitnesses, who claims he was shot by an acquitted co-defendant, testified that Whitley had been physically beaten the day before by the person who, he testified, Whitley shot.

On September 15, 1983, Whitley appeared before the Honorable David Stadtmauer for sentencing. His lawyer reported that he "has consistently denied his involvement in these shootings." (Sentencing Tr. 5.) Whitley was permitted to address the Court and he asserted that Belinda McMillan had recanted her trial testimony:

> A couple of days after the trial ended Belinda McMillan, the district attorney's witness, spoke to a girl named Debby Washington, the girl who she used her name at one time she got busted for prostitution. They had a conversation and Belinda told Debby that— that she didn't see me out there, she didn't see me shoot nobody and that, um, she spoke to a lawyer and a lawyer said she could change her statement. And asked her, you know, I don't think it's right, he's getting ready to get life in prison. She said, well, I have to wait 'till [co-defendant Robert Gales] comes home.
>
> * * * *
>
> But what I want to ask you is maybe before you sentence me to give me a hearing with Belinda and Debby here so Belinda can hear what Debby has to say and maybe she will admit about their conversation.

(Id. 10-11.) The Court told Whitley "that is something that you'll have to discuss with your attorney. Your attorney knows how to proceed in a situation like that, if there's any grounds on which to proceed." (Id. 11.) Whitley's attorney then orally moved to vacate the conviction on the dual grounds of newly discovered evidence, including a sworn statement by Deborah Washington, the Debby referred to by the defendant. (Id. 12.) Washington's sworn statement was marked as an exhibit and submitted to the Court. (Id. 13.)

The Court denied the motion, noting that the Washington statement did not state specifically that McMillan had recanted. (Id. 15.) "It's confusing, ambiguous and even aside from all of that, there was sufficient evidence in the case, even aside from Belinda Williams [sic] testimony, to warrant the jury to find a verdict of guilty of murder." (Id.) The Court also denied an evidentiary hearing on the ground that the content of the written statement was inadequate to warrant a hearing. (Id. 15-16.) The Court noted that its ruling

was "without prejudice to any future motion which may be made in the event some further, newly discovered evidence of any type should arise." (Id. 15.)

The defendant was sentenced to 25 years to life for the murder of Milton Abrams and 5 to 15 years for assault in the first degree on Todd Williams. (Id. 16.) The Clerk informed defendant of his right to appeal. (Id. 18.)

Defendant filed a motion to vacate his convictions pursuant to N.Y. Crim. Proc. L. § 440.10, which motion was denied on July 8, 1985. Whitley's convictions were affirmed by the Appellate Division, First Department. People v. Whitley, 128 A.D.2d 449 (1st Dep't 1987). He moved for reargument, which was granted, and he was permitted to file a pro se supplemental brief. The Court considered a host of issues that he raised in his supplemental brief, including the ineffective assistance of trial counsel in not calling a witness to explain Whitley's medical records purportedly showing that he had been beaten at the hands of the murder victim. The Court adhered to its prior ruling. People v. Whitley, 164 A.D.2d 782 (1st Dep't 1990). Leave to appeal to the New York Court of Appeals was denied. People v. Whitley, 76 N.Y.2d 945 (1990).

Whitley filed another motion to vacate under section 440.10 on October 3, 1994, which motion was denied and leave to appeal was denied by the Appellate Division on July 13, 1995.

Whitley filed a coram nobis application in the Appellate Division in March 1997, citing the exchange at sentencing before Justice Stadtmauer. He annexed a copy of a letter of April 26, 1990 written by his lawyer after interviewing McMillan and the lawyer's notes of his interview with McMillan. He asserted that his appellate counsel was ineffective in not pursuing the issue further. The writ was denied on April 9, 1998. He

moved twice to reargue the denial of his petition, which motions were denied by the Appellate Division on January 26, 1999 and June 29, 1999.

Whitley filed a petition for a writ of habeas corpus in this Court on May 19, 2000. The petition did not specify grounds for the grant of the petition, although he annexed many of his prior briefs and asserted that he was innocent.

On June 26, 2007, after reassignment to me, I granted leave to file an amended petition. The Amended Petition asserts that petitioner was denied effective assistance of counsel at trial (¶ 28) and on his state direct appeal (¶ 17). I also granted petitioner's counsel's motion to expand the record to include materials that have never been presented to any state court. McMillan is deceased. To prove her recantation, petitioner submitted the affirmation of trial counsel, the notes of trial counsel's 1990 interview of McMillan and the affidavits of trial counsel's secretary who prepared the notes and Whitley's former wife who accompanied McMillan to the lawyer's office in 1990. Petitioner also submits the 2003 declaration of Celia Lopez, a second trial witness who was called by a co-defendant, recanting her testimony that Whitley was a shooter and stating that the now deceased McMillan repeated her recantation to her. The Lopez declaration has never been presented to any state court.

I held a hearing on February 26-27, 2008, at which six witnesses testified. Petitioner called as witnesses his friend, Karen Moore, and his former common-law wife, Karen Davis, formerly known as Karen Whitley and Karen Dash. Moore's and Davis' testimony at the hearing was materially consistent with their testimony at the original trial. Petitioner called Deborah Washington, who testified consistent with her declaration. Petitioner also testified on his own behalf.

Petitioner also called Lopez to testify at the hearing. The parties stipulated to the admission of a statement from Lopez which was taken a few weeks prior to the evidentiary hearing by assistant district attorneys from the Bronx District Attorney's Office. As discussed in further detail below, Lopez's testimony at the hearing and her statement to the ADA's contained material variances from her 2003 declaration.

At the hearing, respondent presented testimony by the assistant district attorney who interviewed the eyewitnesses and the detectives and presented the case against petitioner to the grand jury. Two of the officers who investigated the shootings also testified at the hearing. Respondent's witnesses had very little independent recollection of the events leading to petitioner's arrest and conviction.

The evidence at the hearing before me casts no serious doubt on Whitley's guilt. Lopez, whose account was rife with inconsistencies, adhered to the testimony she gave at trial that she saw Whitley shoot one or more of the victims. (Hearing Tr. 26, 55-57.) The recantation of the deceased McMillan is highly suspect. She traveled to Whitley's lawyer's office to recant in the company of Whitley's wife. At the time, Whitley's lawyer described her as "not a credible witness." (Letter of Philip B. Stone, dated April 26, 1990, with enclosures.) The trial testimony of one of the victims who testified that he saw Whitley shoot at close range is not challenged in the present proceeding.

1. "[W]hether Whitley pursued his actual innocence claim with reasonable diligence . . . ."

In the context of equitable tolling of the AEDPA statute of limitations, the Circuit has described the proper standard of diligence as follows:

> The standard is not "extreme diligence" or "exceptional diligence," it is *reasonable* diligence. On remand, the district court should ask: did the petitioner act as diligently as reasonably could have been expected *under the circumstances*?

Baldayaque v. United States, 338 F.3d 145, 153 (2d Cir. 2003) (emphasis in the original). Defendant's incarcerated status, education, language skills and financial resources to obtain counsel may be among the relevant considerations. Id.

Petitioner Whitley has shown no inability to pursue his rights, despite his lack of financial resources, limited education and incarcerated status. It was Whitley who directly raised the McMillan recantation with Justice Stadtmauer in 1983. (Sentencing Tr. 10.) His many pro se filings in state courts over the years have been most impressive in their thoroughness and content. Whitley testified at the evidentiary hearing that he did not do any independent legal research in connection with his pro se filings, but that, with the exception of one which he prepared himself, they were all prepared at his request by inmates he encountered in the prison system who had ample access to the law library. (Hearing Tr. 157-72.) He usually paid for the services of these so-called "legal guys in the jail." (Id. 159.) He testified that he gave input as to the contents of the documents, and that he reviewed them before filing. (Id. 161, 164.)

When, in 1987, his lawyer filed an appellant's brief that was not to his liking, he was successful in persuading the Appellate Division to allow him to file a pro se supplemental brief. According to Whitley, a pro se application for leave to appeal to the New York Court of Appeals, dated September 11, 1990, "raised seven issues which assigned appellate counsel failed/refused to raise." (Motion dated October 5, 1994 at 9.) A 51-page pro se brief which he filed in the Appellate Division in 1989, demonstrates a thorough awareness of the Sixth Amendment guarantee of effective assistance of trial counsel – one of the two grounds asserted more than a decade later in his amended federal habeas petition.

With respect to the McMillan recantation, Whitley raised the issue in state court on two occasions prior to his filing of his habeas petition—in 1983, at his sentencing,

and in a 1997 submission to the First Department complaining of the ineffective assistance of appellate counsel. In the 1997 filing, he expressed his "complete dissatisfaction" with his attorney's brief and sought and was granted leave to file his own pro se supplemental brief asserting six issues not covered by his attorney which, notably, did not include the McMillan recantation. (Whitley Affidavit dated March 27, 1997 ¶ 27.) He stated that "a new appellate counsel would have found other arguments or would have been more articulate in the presentation of the case on appeal." (Id.) In the course of recounting the background and the reasons for the belief that appellate counsel was ineffective, he recounts the McMillan reference in the 1983 sentencing proceeding and his lawyer's 1990 interview of McMillan. (Id. ¶¶ 6-7.)

Whitley is intelligent and obtained an associate's degree in 1986. (Hearing Tr. 157.) He competently and diligently pursued his primary arguments in state court. The record does not support the conclusion that he placed a high chance of success or priority on the McMillan recantation issue. His pursuit of the McMillan recantation was intermittent, at best. He knew that the trial judge denied his first motion (at the time of sentencing) without prejudice to his making a more formal motion. (Id. 173.) Whitley did not pursue the McMillan recantation with diligence that was reasonable under the circumstances.

The purported recantation of Celia Lopez, a witness for a co-defendant who also identified Whitley as a shooter, has never been presented to any state court and no satisfactory reason for having failed to do so has been presented. Petitioner has not demonstrated that he exercised reasonable diligence in pursuing the Lopez recantation.

2. Must a claim of actual innocence be pursued with reasonable diligence?

This Court has been asked to consider the following: "if he did not pursue the claim with reasonable diligence, whether an actual innocence claim must be pursued with

reasonable diligence in order to raise the issue of whether the United States Constitution requires an 'actual innocence' exception to the AEDPA statute of limitations . . . ." Whitley, 317 F.3d at 223. Neither petitioner nor respondent has had much to say on the issue.

I view the issue as one of standing. A habeas petitioner who has not been reasonably diligent in pursuing a claim of actual innocence arguably has not been impacted by AEDPA's one-year statute of limitations. A court must "construe a federal statute to avoid constitutional questions where such a construction is reasonably possible." Arnett v. Kennedy, 416 U.S. 134, 162 (1974). Reasonable diligence is a prerequisite to equitable tolling of AEDPA's one-year limitations period for other types of claims, such as attorney incompetence, see Baldayaque, 338 F.3d at 152; Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (citing Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996)), and I see no reason why the same should not be true for equitable tolling based on actual innocence, as well as for a constitutionally-based exception to the AEDPA statute of limitations. Other Courts have held that reasonable diligence in pursuing an actual innocence claim is a prerequisite to equitable tolling of the AEDPA statute of limitations. See, e.g., Flanders v. Graves, 299 F.3d 974, 977-78 (8th Cir. 2002); Gildon v. Bowen, 384 F.3d 883, 887 (7th Cir. 2004). To hold otherwise would be inconsistent with AEDPA's objectives of avoiding undue delay and promoting finality. See Smith, 208 F.3d at 17.

Whitley knew of the basis for an actual innocence claim and had the practical ability to assert it prior to the commencement of the AEDPA limitations period. He cannot credibly claim that the limitations period hampered his ability to assert ineffective assistance of trial or appellate counsel, his present habeas claims. Cf. Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).

3. <u>Does Whitley make a credible claim of actual innocence?</u>

"In order to show actual innocence, 'a petitioner must present "new reliable evidence that was not presented at trial" and "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt."'" <u>Whitley</u>, 317 F.3d at 225 (quoting <u>Lucidore</u>, 209 F.3d at 114). "[T]he habeas court must determine whether the new evidence is trustworthy by considering it on its own merits and, where appropriate, in light of the pre-existing evidence in the record. Once it has been determined that the new evidence is reliable, . . . reviewing courts consider a petitioner's claim in light of the evidence in the record as a whole . . . ." <u>Doe</u>, 391 F.2d at 162 (citing <u>Schlup v. Delo</u>, 513 U.S. 298, 327-28 (1995)). "[T]he inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." <u>House v. Bell</u>, 547 U.S. 518, 538-39 (2006).

  A. <u>Evidence at trial</u>

Todd Williams, who was 16 years old at the time of the trial, testified for the prosecution at trial that, on June 9, 1982, he saw petitioner Whitley in a physical fight with Milton Abrams, a friend of Williams at the Edenwald Projects in the Bronx. (July 8 Trial Tr. 633-38; July 12 Trial Tr. 866-68.) Williams had seen Whitley "a couple of times" before, both in daytime and at night. (July 12 Trial Tr. 862-63.)

Williams testified that the following night around 12:30 a.m., he was sitting on a chain fence with Abrams and another friend, Carlton Hankins, when he observed Whitley and co-defendants Robert Gales and Michael Murphy, who was known as Messiah, approach from different directions. (July 8 Trial Tr. 640-45.) Williams testified that he was shot by Messiah, Gales shot at Hankins and Whitley fired at Abrams. (<u>Id.</u> 646.) Williams had

smoked marijuana earlier that day. (July 12 Trial Tr. 831-32.) Hankins and Abrams died of their wounds.

Belinda McMillan, who was 27 years old at the time of the trial, testified that she had seen Whitley a "million times" before the shooting over a fifteen year period. (July 5 Trial Tr. 231.) She testified that she observed Whitley fire at Abrams and also saw him firing at Hankins and in the direction where Williams was sitting. (Id. 142-46.) She was approximately fifteen feet away from Whitley while he was shooting, and then he turned and ran in her direction. (Id. 146.) McMillan saw Whitley wearing a hood. (Id.) Williams did not observe a hood. (July 12 Trial Tr. 860.)

Co-defendant Murphy, who was tried with Whitley, called Celia Lopez as a witness. Lopez, who was 20 years old at the time of the trial, testified that she had seen Whitley many times before the night of the shooting. (July 15 Trial Tr. 1376-78, 1380-82.) She testified that she observed Whitley fire a gun at Abrams, Hankins and Williams. (Id. 1314-15, 1385.) She was standing approximately twenty-five feet away from Whitley and she viewed him from the side. (Id. 1370-71; July 18 Trial Tr. 47.) She did not observe Whitley wearing a hood. Lopez also testified that she saw McMillan at the scene. (Id. 1330-31.) Lopez acknowledged in front of the jury that previously she had told petitioner's lawyer that she did not know who the shooter was and did not observe petitioner during the shooting. (July 18 Trial Tr. 4-7.)

McMillan was interviewed by detectives the day after the shooting and identified one of the shooters as "Calvin" with a last name of "Whitty" or "White." (July 5 Trial Tr. 216-19.) Williams was interviewed by detectives on the evening of June 10 and reported that the person who shot Abrams was "Calvin" and that he had been in a fight with Abrams the day before the shooting. (July 8 Trial Tr. 661; July 12 Trial Tr. 869.) He also

indicated that there were two other shooters. (July 8 Trial Tr. 603, 611-18.) There was a conflict in the trial testimony as to whether Williams had described the other shooters as short. He denied having done so (id. 711), although one of the detectives testified otherwise (id. 603). Gales and Murphy were around six feet tall. (July 6 Trial Tr. 300-01, 399.) Within a few days of when he was initially questioned by the police, Williams identified the other two shooters as "Rob" and "Messiah." (Id. 305; July 8 Trial Tr. 583-85, 611-18.) Lopez testified that she reported what she had seen to Detective Kelly at the 47th Precinct at approximately 11 A.M. on the morning of the shooting. (July 15 Trial Tr. 1318, 1342-44, 1364-66.) She said that she picked Whitley's picture out of a photo array. (Id. 1364-66.) Detective Kelly was not called as a witness at trial.

Petitioner called two alibi witnesses at trial. Karen Moore, who had been a friend of petitioner's for more than nine years, testified that she was with defendant in his apartment at the time of the shooting, along with Karen Davis. (July 19 Trial Tr. 175-176.) Davis confirmed the story. (July 18 Trial Tr. 128-30.) Both witnesses also confirmed that defendant displayed signs of having been beaten up the day before the shooting. (Id. 126-27; July 19 Trial Tr. 178.)

Murphy and Gales were acquitted at trial. Whitley was convicted. Petitioner speculates that the jury must have rejected the testimony of Williams in its entirety. Williams, unlike McMillan and Lopez, was present throughout the event. McMillan arrived after hearing shots and Lopez turned away and ran once the shooting began. McMillan and Lopez may have created reasonable doubt as to Gales and Murphy; it does not necessarily follow that the jury disbelieved Williams' testimony in its entirety.

B. New evidence

The only claim of "actual innocence" based upon "new" evidence which petitioner presented to a state court was the McMillan statement to Deborah Washington, which was presented to the trial judge at the time of sentencing and in a 1997 appellate brief. On remand from the Second Circuit, petitioner, now represented by counsel, supplements the record with the affirmation of the petitioner's trial counsel and his secretary and the notes of the McMillan interview. Petitioner also submits his now former wife's affidavit, who accompanied McMillan to the lawyer's office. The notes reflect that McMillan said that "[t]he guy who was shooting ran past me and he was wearing a hood, but he did not look like Calvin, he was shorter than Calvin." McMillan again confirmed that she saw Calvin getting beaten up the day before the murders but denied having seen the other participant in the fight. The lawyer's interview of McMillan took place on Thursday, April 19, 1990, and McMillan said she had last sniffed cocaine that Monday; she acknowledged having one beer before coming to the lawyer's office.

Shortly after the 1990 interview, the lawyer wrote to petitioner regarding his impressions of the credibility of McMillan and her new version of events:

> In my view she is not a credible witness; all she remembers is that she made the wrong I.D. and in any case even without her testimony against you there are still two other eye witnesses to the shooting who identified you and other witnesses who said that you are the person who got beaten up by the deceased the night before.

(Letter of Philip B. Stone, dated April 26, 1990, with enclosures.)

Petitioner and his counsel were given a full and fair opportunity to call witnesses and present evidence at a hearing before this Court. Deborah Washington, who was not a trial witness, testified that she had known petitioner and Davis for more than 30 years. (Hearing Tr. 117.) Washington also was acquainted with McMillan for a significant amount

of time. (Id. 117-19.) She said that McMillan was a heroin addict. (Id. 139.) Washington corroborated McMillan's testimony at trial that McMillan had used Washington's name as an alias when she was arrested for loitering for prostitution. (Id. 138-39.) Washington testified that it happened numerous times, and that McMillan also used her name as an alias when she was arrested on drug charges. (Id.)

Washington testified that, in July 1983, shortly after the trial, she approached McMillan and asked her what happened at the trial because she had heard from people in the neighborhood that McMillan had perjured herself. (Id. 119.) McMillan told Washington that she lied during her testimony at the trial. (Id.) Washington did not recall at the hearing what state of mind McMillan appeared to be in during their conversation. (Id. 145.) Washington asked Davis to write a letter memorializing what McMillan told her because Washington's own handwriting was too sloppy. (Id. 144.) She stated that she told Davis "exactly what to write." (Id. 120-21.) Washington had the letter notarized and gave it back to Davis. (Id.)

Washington has a significant criminal history which includes arrests for petit larceny and drug possession. (Id. 124-36.) She has struggled with drug addiction in the past. (Id. 125-26.) She reported that her last problem with drug use was in 2006, when she used crack cocaine and marijuana. (Id.) She testified that in 1983, she was using marijuana and alcohol, but that she was not using crack cocaine. (Id. 126.)

As noted, petitioner also supplements the record with the declaration of Celia Lopez, which states that McMillan told her that she had lied when she testified that she saw Whitley shoot the victims. Lopez made the declaration at the request of Whitley's daughter. (Id. 38-39.) In her subsequent statement to the ADA's and in her testimony at the hearing, Lopez made multiple inconsistent statements, sometimes within a matter of minutes. For instance, in her declaration, Lopez states that, during 1982 and 1983, she was using crack

cocaine and that "everything was a fog to [her]." (Lopez Decl. 2.) In her statement to the ADA's, Lopez stated that she began using drugs sometime after the shootings and before the trial, but that she had not used any on the day of the trial. (Lopez Stmt. SL14-19.) At trial, Lopez testified that she had never used drugs (July 15 Trial Tr. 1329); at the hearing, after first insisting that that was an honest statement, she ultimately admitted that the statement was untruthful (Hearing Tr. 31-34, 39-42).

Lopez stated in her declaration that she does not know who shot any of the victims and that she identified Whitley at trial because she was angry about the murder of her brother, which occurred the day after the murder and assault for which Whitley was tried and convicted. (Lopez Decl. 2.) At the time of trial, Whitley had been indicted for the murder of Lopez's brother. But at trial, Lopez testified that she was certain that another individual— Derrick Johnson—was responsible for her brother's death. (July 18 Trial Tr. 7-8.) In addition, she testified at trial that she had identified petitioner as the shooter in a photo array at the police station prior to her brother's death. (July 15 Trial Tr. 1318, 1342-44, 1364-66.) In her statement to the ADA's and at the hearing, Lopez seems unsure about the timeline of events, suggesting that perhaps she did not identify Whitley as the shooter until after she had heard that he was responsible for her brother's murder. (Lopez Stmt. SL29-36, SL58-72, SL85-93; Hearing Tr. 53-58.)

Furthermore, in her statement to the ADA's, Lopez said that she testified truthfully at trial as to her belief that petitioner was the shooter, but that she now believes, based on rumors she has heard in the neighborhood, that Derrick Johnson shot the three victims. (SL23-25, SL29-31.) However, at the evidentiary hearing, on direct examination by counsel for Whitley, Lopez stated that she did not personally know who committed the

shootings, but that she believes it was petitioner. (Hearing Tr. 25-26.) On cross-examination, Lopez reiterated that she saw Whitley do the shooting. (Id. 55-57.)

The material inconsistencies between Lopez's 2003 declaration, her statement to the ADA's and her testimony at the hearing cast serious doubt on her on-again, off-again recantation. Her answers to important questions regarding the events surrounding the shootings seem to vary depending on how a question is phrased and who is doing the questioning. I conclude that her present recantation is untrustworthy.

This is not a case where DNA, a fingerprint, a new witness or a new found document supports the claim. "It is axiomatic that witness recantations 'must be looked upon with the utmost suspicion.'" Haouari v. U.S., 510 F.3d 350, 353 (2d Cir. 2007) (quoting Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003)). The after-the-fact statements of the deceased McMillan are suspect. McMillan went to Whitley's lawyer's office in the company of Whitley's wife. (Davis Aff. ¶ 5.) The lawyer viewed her as "not a credible witness." (Letter of Philip B. Stone, dated April 26, 1990, with enclosures.) Deborah Washington was friends with Whitley and his wife (Hearing Tr. 117), and had reason to dislike McMillan because McMillan had used her name as an alias when she had been in trouble with the police (id. 138-39). Washington confirmed that McMillan was a heroin addict. (Id. 139.) Lopez indicated that McMillan appeared to be high when she told her that she had lied at trial. (Id. 48.)

McMillan's trial testimony was supported by her identification of Whitley as a shooter on the day of the crime. (July 5 Trial Tr. 165-66; July 6 Trial Tr. 248.) She had seen Whitley "a million times" before and the danger of misidentification was low. (July 5 Trial Tr. 231.) At the evidentiary hearing, Detective Michael Lagiovane testified that he did not suggest the name Calvin Whitley to McMillan and that she was not coerced or threatened into

testifying. (Hearing Tr. 193.) Colby, the assistant district attorney who presented the case to the grand jury, testified that he did not coerce McMillan into testifying before the grand jury. (Id. 187-88.)

Lopez, in the years since trial, has had a hard life and, around the time of the trial, began using crack. (Lopez Stmt. SL14-19; Hearing Tr. 31-34, 39-42.) She confirmed at the hearing before me that McMillan was in the area of the shooting on the night of the shooting. (Hearing Tr. 59.) Lopez also confirmed at the hearing that she truthfully testified at trial that she saw the shooting and that Whitley did the shooting. (Id. 55.) She confirmed that she picked him out as the shooter because she believed that he was the shooter. (Id.) She had seen him on three or four prior occasions. (Id. 56.) In fairness, Lopez made other statements at the hearing which are consistent with her 2003 declaration, including that she does not know today who committed the shootings (id. 25), and that McMillan told her she had lied at trial (id. 30).

This Court finds that the new evidence presented by petitioner is unreliable. The recantations of McMillan and Lopez are highly suspect and unworthy of belief. Petitioner's "actual innocence" claim fails.

Apart from the lack of reliability of the new evidence, this Court notes that there was other evidence presented at trial which strongly supported the finding of Whitley's guilt. The testimony of Williams, a victim of the close range shootings, has not been shown to be unworthy of belief. He saw Whitley in a fight with Abrams the day before the murders (July 8 Trial Tr. 633-38; July 12 Trial Tr. 866-68), thereby giving Whitley a motive for revenge. The two acquitted defendants did not have similar motives. Whitley's own wife corroborated a portion of the testimony of Williams in that she observed fresh bruises and injuries to Whitley the day before the shooting. (July 18 Trial Tr. 126-27.)

Because petitioner does not make a credible claim of actual innocence, it is not necessary to address whether the Constitution requires an "actual innocence" exception to the AEDPA statute of limitations.

It is important to note that the state of New York provides effective judicial remedies to a convicted person with new evidence of actual innocence. It places no numerical limit on motions to vacate a judgment. Petitioner did not take an appeal from the trial court's denial of his application, made at the time of sentencing, which first asserted a McMillan recantation. He never raised the issue again until a 1997 submission to the First Department complaining of the effective assistance of appellate counsel. He never presented a claim based on the testimony of Celia Lopez to any state court.

New York provides an effective judicial remedy to a person who has new evidence that he did not commit the crime of which he stands convicted. It permits multiple applications under section 440.10 of the Criminal Procedure Law. Section 440.10 is New York's statutory anologue to the writ of <u>coram nobis</u> and several grounds are authorized for vacating a judgment, including:

> (g) New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence . . . ."

Also, under the New York Constitution, the Governor has the power "to grant reprieves, commutations and pardons after conviction, for all offenses except treason and

cases of impeachment, upon such conditions and with such restrictions and limitations, as he or she may think proper . . . ." New York State Constitution, Article IV, Section 4.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED. The petition is time barred and the unreliability of the new evidence precludes the application of any exception to or tolling of the limitations period by reason of the petitioner's "actual innocence." The determination of unreliability does not turn on an issue on which reasonable judicial minds could disagree. It is based upon a straightforward finding of fact after an evidentiary hearing. Petitioner has not made a substantial showing of the denial of a constitutional right on any ground, and a certificate of appealability will not issue. 28 U.S.C. § 2253. The prior certificate issued by the Court of Appeals was for "limited purposes." 317 F.3d at 226. This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438 (1962).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
June 19, 2008